UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA and the States
of GEORGIA, FLORIDA, TENNESSEE,
INDIANA, NORTH CAROLINA, IOWA,
COLORADO, OKLAHOMA, TEXAS and
VIRGINIA and  BEVERLY POWELL,

Case No.:   3:18CV-286 RGJ

            Plaintiff/Relator,

FILED
VANESSA L. ARMSTRONG, CLERK

MAY - 8 2018

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

v.

AEROCARE HOLDINGS, INC.

            Defendant.

_____/

**COMPLAINT PURSUANT TO THE**
**FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3730(b)(2))**

COMES NOW, UNITED STATES OF AMERICA ex rel. BEVERLY POWELL ("Relator"), and hereby submits the following Complaint under seal in accordance with the requirements of the Federal False Claims Act, 31 U.S.C. §3730(b)(2), the Colorado Medicaid False Claims Act. Col. Rev. Stat. § 25.54-303.5 through 25.5-4-3 10; the Florida False Claims Act, Fla. Stat. §68.081 et seq.; the Georgia State False Medicaid Claims Act. Ga. Code §49-4-168, et seq.; the Indiana False Claims and Whistleblower Protection Act, Burns Ind. Code Ann. §5-¬11-5.5. et seq.; the Iowa False Claims Law, Iowa Code § 685.1 et seq.; the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 ci seq.; the Oklahoma Medicaid False Claims Act, 63 Okla. Stat. §§5053, et seq.;the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §71-5-181, et seq.;: the Tennessee False Claim Act, Tenn. Code Ann. §4~18-101, et seq.; the Texas Medicaid Fraud Prevention Act, Tex. Hum, Res. Code, §36.001. et seq.; and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1, et seq.

## I.    INTRODUCTION

1.    This matter involves the submission of false claims for payment made to and paid by Medicare and Medicaid, and perhaps other federally-funded government healthcare programs, for oxygen tank contents (referring to oxygen tanks) that were never delivered to beneficiaries.

2.    Relator began working for Premier Home Care ("PHC") in June 2000 as an accounts receivable ("AR") Specialist and grew with the company, eventually becoming a Revenue Cycle Manager in 2012, a position she currently holds.

3.    In November 2016, PHC was purchased by Defendant AeroCare Holdings, Inc. ("Defendant").   Soon after the purchase, Defendant sent in a transition team led by their Regional Reimbursement Manager Sheri Mounce.   When Relator first met Sheri Mounce, she was assured Defendant operated much like PHC in the sense that the policy of the company was to do everything by the book.   Prior to being bought by Defendant, PHC always made sure the required documents, such as the Certificate of Medical Necessity ("CMN"), Detailed Written Order ("DWO"), etc., were on file prior to dispensing any prescribed equipment or supplies.

4.    Relator quickly realized the assurances provided by Sheri Mounce were nothing more than talking points and that Defendant operated much differently than PHC had done in the past.   Defendant quickly put a policy in place that oxygen customers were never, or very rarely, turned away, regardless of whether the customer qualified for services under Medicare guidelines.

5.    As Relator and others were being trained on the new software system Defendant used, known as Brightree, she noticed Defendant was billing code E0443 on a recurring basis. This is the portable refill code used in Medicare billing after Medicare has paid the 36th month rental for oxygen and equipment. This code would normally be billed when a customer who uses

portable oxygen is given refills, or tanks.

6.      Defendant is purposely adding code E0443 to every Medicare oxygen customer to bill every month after the 36th month, regardless of whether oxygen tank contents are actually delivered.  Thus, Defendant ensures profitability by billing Medicare continually and from each location for oxygen tank contents on an automatic basis.

7.      Based on the Federal False Claims Act and those state counterparts referenced herein, Relator seeks to recover damages and civil penalties arising from the false or fraudulent records, statements, and/or claims that the Defendant made or caused to be made by billing Medicare, Medicaid, and other government-funded healthcare programs for medically unnecessary and/or phantom oxygen services and supplies.

## II.      PARTIES

### A.  Relator

8.      Under the FCA, a person with knowledge of false or fraudulent claims against the government (a "relator") may bring an action on behalf of the government and himself. Relator is an original source of information within the meaning of the federal False Claims Act, 31 U.S.C. § 3730(e)(4)(B).

9.      Beverly Powell is a resident of Sellersburg, Indiana. Ms. Powell began working for Defendant in November 2016 when it purchased the company she was working for, Premier Home Care.

10.      Ms. Powell currently holds the position of Revenue Cycle Manager with Defendant.

### B.  Defendant

11.      Defendant, AeroCare Holdings, Inc., is a state of Delaware Corporation,

incorporated on October 9, 2002 with active registration #3568419. The Registered Agent for the corporation is listed as The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. The corporation is headquartered at 3325 Bartlett Blvd, Orlando, FL 32811, and it is registered with the state of Florida as a Foreign Profit Corporation. Stephen P. Griggs is listed as the President and Joseph Russell is listed as Vice President/Chief Financial Officer.

12.     Defendant operates under a variety of names, such as Matrix Medical, Encore Respiratory, Alliance Oxygen, Hobbs Home Medical, North Georgia Respi-Care, Quality Plus, Twin Rivers Respiratory Care, Hometown Respiratory Consulting, All American Oxygen, Respicare, Inc. and Atlantic Medical to name a few, and operates in numerous states such as Florida, Georgia, Alabama, Arkansas, Tennessee, Indiana, Kentucky, North Carolina, West Virginia, Iowa, Colorado, Oklahoma, Missouri, Pennsylvania, Texas, and Virginia. In 2015 the company reported annual revenue of $150 million.[1]

## III.  JURISDICTION AND VENUE

13.     Jurisdiction is proper in this Court because Relator seeks remedies on behalf of the United States for multiple violations of 31 U.S.C. §3729.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1345.

15.     Relator has made voluntary disclosures to the government prior to the filing of this lawsuit as required by 31 U.S.C. §3730(b)(2).

16.     This Court has personal jurisdiction over Defendants because as described herein they transact business in this District and because the acts complained of herein occurred in this

---

[1] https://www.goodwinlaw.com/news/2014/10/10_27_14-goodwin-represents-aerocare-in-merger-with-mergeworthrx

District.

17.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because Defendant transacts business in this District, and because the acts alleged herein to be in violation of 31 U.S.C. §3729 occurred in this District.

## IV. COST REPORTING AND CLAIMS PROCESSING PROCEDURES UNDER THE MEDICARE PROGRAM

18.     In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395, et seq., known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  See 42 U.S.C. §§ 426, 426-1.

19.     Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

20.     CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u).  In this capacity, the fiscal intermediaries act on behalf of CMS.  42 C.F.R. § 413.64.  Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

21.     There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions

or prevent them.  42 U.S.C. §§ 1395j-1395w-5.  The allegations herein involve Medicare Part B
services billed by the Defendants to Medicare.

22.     In order to get paid from Medicare, providers, like Defendants herein, complete
and submit a claim for payment on a designated Health Insurance Claim Form, which, during the
relevant time period, was or has been designated CMS 1500.  This form contains patient-specific
information including the diagnosis and types of services that are assigned or provided to the
Medicare patient.  The Medicare Program relies upon the accuracy and truthfulness of the CMS
1500 to determine whether and what amounts the provider is owed. Relator is aware that
Defendant created claims that were sent electronically to Medicare.

23.     To this end, the Health Insurance Claim Form, CMS 1500, contains the following
certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and
> necessary for the health of the patient and were personally furnished by me or
> were furnished incident to my professional service by my employee under my
> immediate personal supervision, except as otherwise expressly permitted by
> Medicare or CHAMPUS regulations.

24.     That certification is then followed by the following "Notice":

> Anyone who misrepresents or falsifies essential information to receive payment
> from Federal funds requested by this form may upon conviction be subject to fine
> and imprisonment under applicable Federal laws.

## V. CONDITIONS OF PARTICIPATION AND PAYMENT

25.     To participate in the Medicare Program, a health care provider must also file a
provider agreement with the Secretary of HHS. 42 U.S.C. §1395cc.  The provider agreement
requires compliance with certain requirements that the Secretary deems necessary for
participating in the Medicare Program and for receiving reimbursement from Medicare.

26.     As a precondition for participation in federally funded healthcare programs,
including Medicare and Medicaid, providers are required to be truthful in submitting claims for

reimbursement.  *See*, *e.g.*, 42 C.F.R. §§ 1003.105, 1003.102(a)(1)-(2).

### A.  Medical Necessity and Appropriateness Requirements

27.     One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information.  42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

28.     Various claims forms, including but not limited to the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations.  42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406.  Providers must also certify that the information submitted is correct and supported by documentation and treatment records.  Id.; see also, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

### B.  Obligation to Refund Overpayments

29.     As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries material omissions or errors they become aware in their claims for reimbursement from federal healthcare programs including Medicare and Medicaid.  42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. See also 42 C.F.R. §§ 489.40, 489.31.  In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony.  Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments.  42 U.S.C. § 1395u; 42

C.F.R. § 489.20(g).

30.     Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS.  42 U.S.C. § 1395u(l)(3).  In such cases, the overpayment is subject to recoupment.  42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments.  42 U.S.C. § 1395l(j).

## VI. OTHER FEDERALLY-FUNDED HEALTH CARE PROGRAMS

31.     Although false claims to Medicare are the primary FCA violations at issue in this case, there were patients enrolled in one of two other federally-funded health care benefit programs – Medicaid and TRICARE.   Accordingly, those other two programs are briefly discussed as well.

32.     TRICARE is a federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.   Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, et seq.).

33.     Like Medicare, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i). And, like the Medicare Program, TRICARE prohibits practices such as submitting claims for services that are not medically necessary.  32 C.F.R. §§ 199.9(b)(3)-(b)(5).

## VII. RULES GOVERNING PAYMENT FOR RESPIRATORY EQUIPMENT SPECIFICALLY

34.     Medicare pays for home oxygen therapy equipment for patients with certain documented medical conditions. *See* Medicare National Coverage Determinations Manual, Pub. 100-03, § 240.2.  This action does not allege any violations of Medicare regulations regarding a patient's qualifications for oxygen therapy.  Rather, the allegations are limited to the billing for oxygen tank contents that were never provided to the patient.

35.     Since 2007, Medicare has paid suppliers on a monthly basis to rent oxygen equipment to beneficiaries.  Payment for accessories (e.g., cannula, tubing, etc.), delivery, back-up equipment, maintenance, and repairs is included in the rental allowance. Payment for oxygen contents (stationary and/or portable) is included in the allowance for stationary equipment (E0424, E0439, E1390, E1391).[2]  Medicare covers 80% of the lesser of (1) the actual charge for the oxygen equipment, or (2) the fee schedule amount for the equipment.  Beneficiaries are responsible for the remaining 20% co-pay. *See* 42 U.S.C. §1395m(a); 42 C.F.R. §414.226.

36.     The supplier who provides oxygen equipment for the first month must continue to provide any necessary oxygen equipment and all related items and services through the 36-month rental period, unless one of the following exceptions is met: (1) the beneficiary relocates temporarily or permanently outside of the supplier's service area, or (2) the beneficiary elects to obtain oxygen from a different supplier.

37.     Medicare caps monthly rental payments to suppliers of home oxygen equipment at 36 months of continuous use.  However, there are patients who need continuous use of oxygen equipment.  In that case, the supplier of the equipment must continue to furnish the oxygen and oxygen equipment, without additional rental payments, for the remainder of the reasonable

---

[2] https://oig.hhs.gov/oei/reports/oei-09-04-00420.pdf

useful lifetime of the equipment (24 more months). After the 36th month, Medicare will pay for both stationary oxygen contents (E0441 or E0442) and portable oxygen contents (E0443 or E0444) if the beneficiary is using that equipment during the 36th rental month. During this 24 month period, suppliers may receive additional payments for delivering oxygen contents and providing standard maintenance.

38.     During this period, the supplier's records must adequately document that the equipment and any related supplies were *actually delivered* to the beneficiary. Suppliers are required to maintain proof of delivery ("POD") for seven years, and provide such proof to Medicare upon request. POD serves to assist in determining correct coding and billing information for claims submitted to Medicare, Medicaid, and other government funded healthcare programs for reimbursement.

39.     The POD must include (1) the beneficiary's name and address, (2) the delivery date, (3) a sufficiently detailed description to identify the item(s) being delivered, (4) the quantity delivered, and (5) the beneficiary's signature and date of signature.

## IV.     THE NATURE OF THE CASE

40.     The Center for Medicare and Medicaid Services ("CMS") statistics showed that in 2015 approximately \$6.5 billion was spent on Durable Medical Equipment ("DME") in the United States.[3] Of that amount, approximately \$1.5 billion was spent on oxygen and related supplies. This is actually a decrease from 2014, but remains a significant amount of taxpayer funds being spent on oxygen therapy.

### A. Medicare for Billing for Oxygen Equipment

41.     In order to bill Medicare for stationary contents or portable contents, certain

---

[3] https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMS-Statistics-Reference-Booklet/Downloads/2015CMSStatistics.pdf

requirements must be met by the supplier:

    (1) Before dispensing refills, **the supplier must contact the patient** no sooner than 14 days before delivery date to ensure that the refilled item remains reasonable and necessary, ensure that existing supplies are approaching exhaustion and confirm any changes to the order.

    (2) The **supplier must contact the treating physician** to verify that any changed or atypical use is warranted.

    (3) The **supplier must deliver refills** in a quantity that does not exceed the patient's expect use, no sooner than 10 calendar days before end of usage for the current product.

    (4) The **supplier must obtain a delivery slip for the actual delivery date.**[4]

42.    Relator has first-hand knowledge that Defendant is not meeting the Medicare requirements with a majority of their customers. Specifically, Defendant has implemented a scheme where each customer who has received oxygen equipment and supplies past the 36th month is set up on an automatic billing system where Medicare is billed monthly using code E0443. This billing occurs even where the beneficiary does not receive the oxygen contents.

43.    Relator also has personal knowledge of a scheme implemented by Defendant in early 2017 following Defendant's purchase of MediHome, a DME company with offices in Kentucky and Tennessee. The Louisville, Kentucky billing office was given the task of adding many of the rentals or "assets" purchased by Defendant from MediHome into the customer accounts within the Brightree software system. The billing office added hundreds of pieces of equipment on hundreds of customers. The list was made up of Medicare, Medicaid and other third party insurers.

44.    Employees were directed by Defendant to add the billing code for the equipment within the system carte blanche and bill for it. Defendant knew that there was no documentation, no Detailed Written Order (DWO), and no revised Certificate of Medical Necessity (CMN)

---

[4] https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Home-Oxygen-Therapy-Text-Only.pdf

showing Defendant as the servicing provider, even though this is a Medicare requirement that must be met prior to billing commencing. Defendant billed Medicare and others for hundreds of pieces of equipment, including CPAP devices, for months with total disregard for the rules in place requiring the aforementioned documentation.

45.     Relator believes that one of Defendant's marketers, Tracie Dillon, is using Home Sleep Study devices she has ownership in order to qualify Medicare beneficiaries for CPAP equipment and supplies in direct violation of the Stark Law. It is also believed that Tracie Dillon is violating the Anti-Kickback statute by providing gifts and other benefits to referrals she receives. Relator can elaborate on these allegations further in an interview.

46.     The Kentucky Board of Pharmacy requires an annual DWO for all customers on portable oxygen, yet Defendant continues to bill even when the annual DWO has not been received. Relator estimates that 90%, or more, of the portable oxygen customers are having their government health insurance billed without an updated annual DWO. Relator knows that Defendant is in direct violation of state guidelines which are required to be followed in order to maintain Medicare contracts, yet they are purposely not following the guidelines as agreed.

47.     When Relator was being trained on the Brightree software system used by Defendant, she became aware that Defendant holds Medicare claims at the first of the year using what they refer to as a "deductible hold". This "deductible hold" is hardcoded within the Brightree software system used by Defendant and is in place so that their customer's deductible will be met by another provider before they attempt to bill Medicare.

**B. Defendant Billed Medicare for Oxygen Contents Never Delivered**

48.     During her employment with Defendant since her employer, PHC, was acquired, Relator has identified the following small sample of patients who have had their Medicare billed

for oxygen contents monthly, which they have never received, using code E0443. These samples include customers from the Jeffersonville, Indiana, Louisville O2 and Lexington, Kentucky branches which were purchased by Defendant prior to the purchase of PHC. These examples are representative of the larger scheme being perpetrated by Defendant companywide. Supportive documentation is in the possession of Realtor's counsel and has been provided to the government; additional names and evidence are available and will be provided to the government at the appropriate time:

      **i.** **Medicare Patient A:** An account statement for Medicare Patient A shows dates of service from June 9, 2015 through January 9, 2018. During this timeframe, a total of 32 months, Medicare was billed on the 9th of each month for which no oxygen content refills were ever delivered to Medicare Patient A and no documentation required by Medicare was maintained in the customer's file. Medicare payments were received by Defendant on the following dates for oxygen that was simply not provided:

| | |
|---|---|
| 06/29/2015 | $43.12 |
| 07/27/2015 | $43.12 |
| 08/26/2015 | $43.12 |
| 09/25/2015 | $43.12 |
| 10/26/2015 | $43.12 |
| 11/25/2015 | $43.12 |
| 12/09/2015 | $54.69 |
| 12/28/2015 | $43.12 |
| 02/25/2016 | $35.19 |
| 03/25/2016 | $43.12 |
| 04/27/2016 | $43.12 |
| 05/25/2016 | $43.12 |
| 06/27/2016 | $43.12 |
| 07/27/2016 | $39.11 |
| 08/18/2016 | $54.47 |
| 08/24/2016 | $39.11 |

| | |
|---|---|
| 09/28/2016 | $39.11 |
| 10/26/2016 | $39.11 |
| 11/29/2016 | $39.11 |
| 12/29/2016 | $39.11 |

Additional payments were received from Medicare by Defendant throughout 2017 and into 2018. The total amount billed during the period of service was $4,500.00, with payments made by Medicare totaling $1,213.49.

ii.   **Medicare Patient B:** An account statement for Medicare Patient B shows dates of service from February 1, 2016 through January 1, 2018. During this timeframe, a total of 17 months, Medicare was billed monthly on the 5th of each month for which no oxygen content refills were ever delivered to Medicare Patient B and no documentation required by Medicare was maintained in the customer's file. Medicare payments were received by Defendant on the following dates for oxygen that was not provided:

| | |
|---|---|
| 07/13/2016 | $54.27 |
| 07/21/2016 | $41.52 |
| 08/24/2016 | $41.52 |
| 09/21/2016 | $41.52 |
| 10/21/2016 | $41.52 |
| 11/23/2016 | $41.52 |
| 12/21/2016 | $41.52 |
| 02/08/2017 | $41.25 |
| 02/22/2017 | $41.25 |

Additional payments were received from Medicare by Defendant throughout 2017. The total amount billed during the period of service was $2,200.00, with payments made by Medicare totaling $650.97. It should be noted that on November 7, 2017, Defendant was required to write off an amount previously billed as the Date of Death of Medicare Patient B preceded the Date of Service

that had been automatically billed to Medicare. This was not an uncommon situation.

iii. **Medicare Patient C:** An account statement for Medicare Patient C shows dates of service from February 1, 2016 through February 1, 2018. During this timeframe, a total of 24 months, Medicare was billed monthly on the 26th of each month for which no oxygen content refills were ever delivered to Medicare Patient C and no documentation required by Medicare was maintained in the customer's file. Medicare payments were received by Defendant on the following dates for oxygen that was not provided:

| | |
|---|---|
| 05/16/2016 | $54.27 |
| 06/10/2016 | $54.27 |
| 07/13/2016 | $54.27 |
| 08/11/2016 | $41.52 |
| 09/14/2016 | $41.52 |
| 10/12/2016 | $41.52 |
| 11/14/2016 | $41.52 |
| 12/14/2016 | $41.52 |

Additional payments were received from Medicare by Defendant throughout 2017. The total amount billed during the period of service was $2,900.00, with payments made by Medicare totaling $990.57.

iv. **Medicare Patient D:** An account statement for Medicare Patient D shows dates of service from June 1, 2015 through February 1, 2018. During this timeframe, a total of 32 months, Medicare was billed monthly on the 11th of each month for which no oxygen content refills were ever delivered to Medicare Patient D and no documentation required by Medicare was maintained in the customer's file.

Medicare payments were received by Defendant on the following dates for oxygen that was not provided:

| | |
|---|---|
| 06/29/2015 | $43.12 |
| 07/29/2015 | $43.12 |
| 08/28/2015 | $43.12 |
| 09/30/2015 | $43.12 |
| 10/28/2015 | $43.12 |
| 11/30/2015 | $43.12 |
| 12/30/2015 | $43.12 |
| 02/29/2016 | $10.56 |
| 03/03/0216 | $43.12 |
| 04/27/2016 | $43.12 |

Additional payments were received from Medicare by Defendant through June 2017. The total amount billed during the period of service was $4,500.00, with payments made by Medicare totaling $830.38.

v. **Medicare Patient E:** An account statement for Medicare Patient E shows dates of service from October 1, 2016 through February 1, 2018. During this timeframe, a total of 16 months, Medicare was billed monthly on the 12th of each month for which only one oxygen content refill was ever delivered to Medicare Patient E and only one delivery ticket, dated October 12, 2016, as required by Medicare, was maintained in the customer's file. Medicare payments were received by Defendant on the following dates for oxygen that was not provided:

| | |
|---|---|
| 11/30/2016 | $39.11 |
| 12/29/2016 | $39.11 |
| 05/05/2017 | $12.99 |
| 06/01/2017 | $39.11 |
| 06/28/2017 | $39.11 |
| 07/28/2017 | $39.11 |
| 08/30/2017 | $39.11 |
| 09/28/2017 | $39.11 |
| 10/30/2017 | $39.11 |

|            |         |
|------------|---------|
| 11/29/2017 | $39.11  |
| 12/19/2017 | $39.11  |

The total amount billed during the period of service was $1,600.00, with payments made by Medicare totaling $443.20.

vi. **Medicare Patient F:** An account statement for Medicare Patient F shows dates of service from July 1, 2015 through February 1, 2018. During this timeframe, a total of 32 months, Medicare was billed monthly on the 4th of each month for which no oxygen content refills were ever delivered to Medicare Patient F and no documentation required by Medicare was maintained in the customer's file. Medicare payments were received by Defendant on the following dates for oxygen that was not provided:

|            |         |
|------------|---------|
| 10/21/2015 | $43.12  |
| 11/19/2015 | $43.12  |
| 12/23/2015 | $43.12  |
| 02/17/2016 | $49.38  |
| 03/23/2016 | $43.12  |
| 04/20/2016 | $43.12  |
| 05/20/2016 | $43.12  |
| 06/22/2016 | $43.12  |
| 07/21/2016 | $34.55  |

Additional payments were received from Medicare by Defendant throughout 2017. The total amount billed during the period of service was $4,400.00, with payments made by Medicare totaling $850.01.

vii. **Medicare Patient G:** An account statement for Medicare Patient G shows dates of service from October 1, 2015 through February 1, 2018. During this timeframe, a total of 28 months, Medicare was billed monthly on the 19th of each month for which no oxygen content refills were ever delivered to Medicare Patient G and no

documentation required by Medicare was maintained in the customer's file. Medicare payments were received by Defendant on the following dates for oxygen that was not provided:

| | |
|---|---|
| 10/31/2016 | $43.12 |
| 10/31/2016 | $43.12 |
| 10/31/2016 | $43.12 |
| 10/31/2016 | $43.12 |
| 10/31/2016 | $43.12 |
| 10/31/2016 | $43.12 |
| 10/31/2016 | $43.12 |
| 10/31/0216 | $43.12 |
| 10/31/2016 | $43.12 |
| 10/31/2016 | $39.11 |
| 10/31/2016 | $39.11 |
| 10/31/2016 | $39.11 |
| 11/03/2016 | $39.11 |
| 12/07/2016 | $39.11 |
| 01/05/2017 | $39.11 |

Additional payments were received from Medicare by Defendant through July 6, 2017. The total amount billed during the period of service was $3,100.00, with payments made by Medicare totaling $911.90.

viii. **Medicare Patient H:** An account statement for Medicare Patient H shows dates of service from August 1, 2015 through February 1, 2018. During this timeframe, a total of 30 months, Medicare was billed monthly on the 14th of each month for which no oxygen content refills were ever delivered to Medicare Patient H and no documentation required by Medicare was maintained in the customer's file. Medicare payments were received by Defendant on the following dates for oxygen that was not provided:

| | |
|---|---|
| 11/06/2015 | $60.72 |
| 11/06/2015 | $60.72 |

| | |
|---|---|
| 11/06/2015 | $60.72 |
| 12/02/2015 | $60.72 |
| 12/30/2015 | $60.72 |
| 02/12/2016 | $52.35 |
| 03/02/2016 | $52.35 |
| 03/30/2016 | $52.35 |
| 05/02/2016 | $52.35 |
| 06/02/2016 | $52.35 |

Additional payments were received from Medicare by Defendant through February 4, 2018. The total amount billed during the period of service was $4,000.00, with payments made by Medicare totaling $1,141.92.

ix. **Medicare Patient I:** An account statement for Medicare Patient A shows dates of service from October 1, 2016 through February 1, 2018. During this timeframe, a total of 16 months, Medicare was billed monthly on the 13th of each month for which no oxygen content refills were ever delivered to Medicare Patient I and no documentation required by Medicare was maintained in the customer's file. Medicare payments were received by Defendant on the following dates for oxygen that was not provided:

| | |
|---|---|
| 10/31/2016 | $39.11 |
| 11/30/2016 | $39.11 |
| 12/29/2016 | $39.11 |
| 02/21/2017 | $39.11 |
| 03/07/2017 | $39.11 |
| 03/29/2017 | $39.11 |
| 05/01/2017 | $39.11 |
| 06/01/2017 | $39.11 |
| 06/29/2017 | $39.11 |

Additional payments were received from Medicare by Defendant through January 31, 2018. The total amount billed during the period of service was $1,600.00, with payments made by Medicare totaling $625.76.

x.  **Medicare Patient J:** An account statement for Medicare Patient J shows dates of service from June 1, 2014 through February 1, 2018. During this timeframe, a total of 44 months, Medicare was billed monthly on the 9th of each month for which no oxygen content refills were ever delivered to Medicare Patient J and no documentation required by Medicare was maintained in the customer's file. Medicare payments were received by Defendant on the following dates for oxygen that was not provided:

| | |
|---|---|
| 09/03/2014 | $43.12 |
| 09/03/2014 | $43.12 |
| 09/04/2014 | $43.12 |
| 09/25/2015 | $43.12 |
| 10/27/2014 | $43.12 |
| 11/26/2014 | $43.12 |
| 12/26/2014 | $43.12 |
| 01/05/2015 | $53.88 |
| 02/05/2015 | $43.12 |
| 02/25/2015 | $43.12 |

Additional payments were received from Medicare by Defendant through February 1, 2018. The total amount billed during the period of service was $6,900.00, with payments made by Medicare totaling $1,630.80.

xi.  **Medicare Patient K:** An account statement for Medicare Patient K shows dates of service from December 1, 2016 through February 1, 2018. During this timeframe, a total of 14 months, Medicare was billed monthly on the 14th of each month for which no oxygen content refills were ever delivered to Medicare Patient K and no documentation required by Medicare was maintained in the customer's file. Medicare payments were received by Defendant on the following dates for oxygen that was not provided:

| | |
|---|---|
| 12/30/2016 | $39.11 |
| 03/07/2017 | $14.88 |
| 03/30/2017 | $39.11 |
| 05/03/2017 | $39.11 |
| 06/01/2017 | $39.11 |
| 06/30/2017 | $39.11 |
| 08/02/2017 | $39.11 |
| 08/30/2017 | $39.11 |
| 10/02/2017 | $39.11 |
| 11/01/2017 | $39.11 |
| 11/30/2017 | $39.11 |

Additional payments were received from Medicare by Defendant through January 31, 2018. The total amount billed during the period of service was $1,400.00, with payments made by Medicare totaling $451.16.

xii. **Medicare Patient L:** An account statement for Medicare Patient L shows dates of service from June 1, 2015 through February 1, 2018. During this timeframe, a total of 32 months, Medicare was billed monthly on the 15th of each month for which no oxygen content refills were ever delivered to Medicare Patient L and no documentation required by Medicare was maintained in the customer's file. Medicare payments were received by Defendant on the following dates for oxygen that was not provided:

| | |
|---|---|
| 08/28/2015 | $43.12 |
| 08/28/2015 | $43.12 |
| 09/09/2015 | $43.12 |
| 10/01/2015 | $43.12 |
| 11/02/2015 | $43.12 |
| 12/02/2015 | $43.12 |
| 12/31/2015 | $43.12 |
| 03/30/2016 | $36.83 |
| 03/30/2016 | $43.12 |
| 03/30/2016 | $43.12 |
| 05/04/2016 | $43.12 |

|            |         |
|------------|---------|
| 06/02/2016 | $43.12  |
| 07/01/2016 | $43.12  |

Additional payments were received from Medicare by Defendant through January 31, 2018. The total amount billed during the period of service was $4,500.00, with payments made by Medicare totaling $1,280.51.

**xiii.** **Medicare Patient M:** An account statement for Medicare Patient M shows dates of service from December 1, 2016 through February 1, 2018. During this timeframe, a total of 14 months, Medicare was billed monthly on the 25th of each month for which no oxygen content refills were ever delivered to Medicare Patient M and no documentation required by Medicare was maintained in the customer's file. Medicare payments were received by Defendant on the following dates for oxygen that was not provided:

|            |         |
|------------|---------|
| 01/11/2017 | $41.52  |
| 04/12/2017 | $34.95  |
| 05/11/2017 | $41.25  |
| 06/12/2017 | $41.25  |
| 07/12/2017 | $41.25  |
| 08/10/2017 | $41.25  |
| 09/13/2017 | $41.25  |
| 10/11/2017 | $41.25  |
| 10/15/2017 | $ 9.60  |
| 11/10/2017 | $41.25  |
| 12/13/2017 | $41.25  |
| 01/11/2018 | $41.25  |

The total amount billed during the period of service was $1,400.00, with payments made by Medicare totaling $457.32.

49.     Relator has found and provided evidence that shows Defendants have operated a scheme to defraud Medicare since at least 2014, and very possibly prior to then. Based upon

Relator's experience working for Defendant, Relator believes this scheme is companywide and systemic and that Defendant has implemented the scheme in every location it has in at least 16 states.

50.    While the underlying scheme involves relatively small amounts, Relator estimates this scheme to defraud Medicare could very easily have cost taxpayers millions of dollars over the life of the scheme, based on the number of locations operated by Defendant and the length of time which customers required services. Defendant continues to commit fraud to this day.

## V.    THE FEDERAL FALSE CLAIMS ACTS

51.    The Federal FCAs, as amended, provide in pertinent part that:

[A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990...plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1).

52.    The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

## VI.    FEDERAL ANTI-KICKBACK LAWS

53.    The federal anti-kickback statute, also known as AKS, arose out of Congressional concern that providing things of value to those who can influence healthcare decisions may

corrupt their professional judgment and result in federal funds being diverted to pay for goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.

54.     The AKS prohibits the payment of kickbacks in order to protect the integrity of Medicare, TRICARE, and other federal healthcare programs. See Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

55.     The AKS prohibits any person or entity from soliciting, receiving, offering, or paying any remuneration to induce a person to, or reward a person for referring, recommending, or arranging for the purchase of any item for which payment may be made in whole or in part by a federal health care program. In pertinent part, the statute provides, under (b) Illegal remunerations:

> (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be
>
> made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
>
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person–
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be

made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S.C. § 1320a-7b(b).

56.     The AKS not only prohibits outright bribes to a physician, but also prohibits offering or paying for any remuneration to a physician that has, as one purpose, inducement of the physician's referrals to federal health care programs. Claims that include items or services resulting from a violation of the AKS are false or fraudulent under the FCA. 42 U.S.C. §1320a-7b(g).

57.     The Office of Inspector General for the United States Department of Health and Human Services ("HHS-OIG") has published safe harbor regulations that define arrangements that are not subject to the AKS because the practice would be unlikely to result in fraud or abuse. Safe harbor protection is afforded only to those arrangements that precisely meet all of the conditions set forth in the safe harbor.

58.     One such statutory safe harbor protects some arrangements between an entity and an independent contractor, but only if the arrangement meets all seven standards. Specifically, the arrangement must (1) be in writing and signed by the parties; (2) cover all services provided by the independent contractor, and specify those services; (3) for part-time work, set forth the schedule, length, and exact charge for the intervals of work; (4) span at least one year; (5) set in advance the aggregate compensation, which must be fair market value and not be determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties; (6) not involve services that involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law; and (7) cover aggregate services that do not exceed those reasonably necessary to accomplish the commercially reasonable purpose of the services.  42 C.F.R. § 1001.952(d).

59.     On March 23, 2010, President Obama signed the Patient Protection and Affordable Care Act (PPACA) into law. The PPACA changed the language of the Anti-Kickback Statute to provide that claims submitted in violation of the statute automatically constitute false claims for purposes of the False Claims Act. The new language provides that "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31 [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

## VII.   THE STARK LAW

60.     Enacted as amendments to the Social Security Act, the Stark Law prohibits an entity from submitting a claim to Medicare for "designated health services" that were referred to the entity by a physician who has a "financial relationship" with the entity, unless a statutory exception applies. 42 U.S.C. §§ 1395nn. The Stark Law is a strict liability statute, and was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable utilization of designated health services.

61.     In particular, the Stark Law provides, in pertinent part regarding prohibition of referrals:

> (A) the physician may not make a referral to the entity for the furnishing of designated      health services for which payment otherwise may be made under this subchapter, and
> (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services      furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

62.     "Designated health services" include physical therapy services, occupational therapy services, and home health services. 42 U.S.C. § 1395nn(h)(6).

63.     A "financial relationship" includes a "compensation arrangement," which means

any arrangement involving any remuneration paid directly or indirectly to a referring physician. See 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

64.     The Stark Law explicitly states that Medicare will not pay for designated health services billed by a healthcare provider when the designated health services resulted from a prohibited referral. See 42 U.S.C. § 1395nn(g)(1). In addition, the regulations implementing the Stark Law expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353 (2006).

65.     The Stark Law and its companion regulations contain exceptions for certain compensation arrangements. These include exceptions for "Personal Services Arrangements," 42 U.S.C. § 1395nn(e)(3), 42 C.F.R. § 411.357(d), and for "Fair Market Value Compensation," 42 C.F.R. § 411.357(l).

66.     Like the "Personal Services and Management Contracts" safe harbor under the AKS, both the "Personal Services Arrangements" and the "Fair Market Value Compensation" exceptions to the Stark Law require, among other things, that: (1) the compensation be consistent with fair market value, and not determined in any manner that takes into account the volume or value of the physician's referrals; (2) the arrangement be "commercially reasonable" and further the legitimate business purposes of the parties; and (3) the services performed under the arrangement not involve the counseling or promotion of a business arrangement or other activity that violates a Federal or State law. 42 U.S.C. § 1395nn(e)(3), 42 C.F.R. §§ 411.357(d), (l).

**VIII. CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Presentation of False Claims**
**31 U.S.C. § 3729(a)(1)(A)**

67.     Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 66.

68.     By and through the fraudulent schemes described herein, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States for payment or approval.

69.     Specifically, Defendants systematically billed Medicare, Medicaid, and other government insurance programs for oxygen content supplies that were never delivered to beneficiaries.

70.     Defendants acted with no regard for medical necessity.  They also acted with complete dishonesty while billing for DME that was delivered to the patient.

71.     Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States through Medicare, Tricare or other government insurance programs,.

### SECOND CAUSE OF ACTION
### Making or Using False Record or Statement to Cause Claim to be Paid
### 31 U.S.C. § 3729(a)(1)(B)

72.     Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 66.

73.     As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

74.     Defendants knowingly made or used false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a) false claims for DME and supplies that was never actually provided;

(b) false records indicating that the DME and supplies billed for was Medically necessary;

(c) false certifications that patients were compliant and therefore eligible for DME and supplies; and

(d) false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid.

**75.**    By virtue of the false records or statements Defendants made or used, the United States Government paid claims it otherwise would not have or should not have and has suffered substantial monetary damages.

### THIRD CAUSE OF ACTION
### Colorado Medicaid Fraud Prevention Act
### Col. Rev. Stat. §§ 25.5-4-305(a)-(b) and (f)

76.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 66 of this Complaint as if fully set forth herein.

77.    This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act, Col. Rev. Stat. §§ 25.5-4-303.5 through 25.5-4-301.

78.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

79.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

80.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Colorado in connection with the Colorado Medical Assistance Act.

81.     The Colorado State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

82.     By reason of Defendant's acts, the Colorado State Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

83.     Additionally, the Colorado State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

### FOURTH CAUSE OF ACTION
### Florida False Claims Act
### Fla. Stat. §§ 68-082(2)(a)-(b) and (f)

84.     Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 66 of this Complaint as if fully set forth herein.

85.     This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. §§ 68-081 through 68-092.

86.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

87.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

88.     By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Florida.

89.     The Florida State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

90.     By reason of Defendant's acts, the Florida State Government has been damaged,

and continues to be damaged, in a substantial amount to be determined at trial.

91.     Additionally, the Florida State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**FIFTH CAUSE OF ACTION**
**Georgia False Medicaid Claims Act**
**Ga. Code Ann. §§ 49-4-168.1(a)(1)-(2), and (7)**

92.     Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 66 of this Complaint as if fully set forth herein.

93.     This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq*.

94.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented to the Georgia Medicaid program, false or fraudulent claims for payment or approval.

95.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

96.     By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Georgia.

97.     The Georgia State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

98.     By reason of Defendant's acts, the Georgia State Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

99.     Additionally, the Georgia State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## SIXTH CAUSE OF ACTION
### Indiana False Claims and Whistleblower Protection Act
### Ind. Code §§ 5-11-5.5-2(b)(1)-(2), and (8)

100.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 64 of this Complaint as if fully set forth herein.

101.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 *et seq.*

102.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

103.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

104.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Indiana.

105.    The Indiana State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

106.    By reason of Defendant's acts, the Indiana State Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

107.    Additionally, the Indiana State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## SEVENTH CAUSE OF ACTION
### Iowa False Claims Act
### Iowa Code §§ 685.2(a)-(b), and (g)

108.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 66 of this Complaint as if fully set forth herein.

109.    This is a claim for treble damages and penalties under the Iowa False Claims Act, Ind. Code §§ 685.1 *et seq*.

110.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

111.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

112.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Iowa.

113.    The Iowa State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

114.    By reason of Defendant's acts, the Iowa State Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

115.    Additionally, the Iowa State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## EIGHTH CAUSE OF ACTION
### Oklahoma Medicaid False Claims Act
### 63 Okla. Stat. §§ 5053.1(B)(1)-(2)

116.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 66 of this Complaint as if fully set forth herein.

117.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act, 63 Okla. Stat. §§ 5051 *et seq*.

118.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

119.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

120.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Oklahoma.

121.    The Oklahoma State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

122.    By reason of Defendant's acts, the Oklahoma State Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

123.    Additionally, the Oklahoma State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## NINTH CAUSE OF ACTION
### Tennessee Medicaid False Claims Act, Tennessee False Claims Act
### Tenn. Code Ann. §§ 71-5-182(a)(1)(A)-(B), and (D), 4-18-101

124.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 66 of this Complaint as if fully set forth herein.

125.    This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 through 71-5-185, and the Tennessee False Claims Act, Tenn. Code Ann 4-18-101 *et seq*.

126.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

127.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

128.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Tennessee.

129.    The Tennessee State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

130.    By reason of Defendant's acts, the Tennessee State Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

131.    Additionally, the Tennessee State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

### TENTH CAUSE OF ACTION
### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §§ 8.01-216.3(a)(1)-(2), and (7)

132.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 66 of this Complaint as if fully set forth herein.

133.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*

134.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

135.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

136.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Virginia.

137.    The Virginia State Government, unaware of the falsity of the records, statements,

and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

138.    By reason of Defendant's acts, the Virginia State Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

139.    Additionally, the Virginia State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**ELEVENTH CAUSE OF ACTION**
**North Carolina False Claims Act**
**N.C. Gen. Stat. §§ 1-607(a)(1)-(2) and (7)**

140.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 66 of this Complaint as if fully set forth herein.

141.    This is a claim for treble damages and penalties under the North Carolina False Claims Act, N.C. Gen. Stat §§ 1-605 *et seq.*

142.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

143.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

144.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of North Carolina.

145.    The North Carolina State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

146.    By reason of Defendant's acts, the North Carolina State Government has been

damaged, and continues to be damaged, in a substantial amount to be determined at trial.

147.    Additionally, the North Carolina State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

### TWELFTH CAUSE OF ACTION
### Texas False Medicaid Claims Act
### Tex. Human Res. Code Ann. §§ 36.002

148.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 66 of this Complaint as if fully set forth herein.

149.    This is a claim for treble damages and penalties under the Texas False Medicaid Claims Act, Tex. Human Res. Code Ann. §§ 36.002 *et seq*.

150.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval.

151.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

152.    By virtue of the acts described above, Defendant knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Texas.

153.    The Texas State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

154.    By reason of Defendant's acts, the Texas State Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

155.    Additionally, the Texas State Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**WHEREFORE**, Relator, on behalf of the United States of America, demands judgment

against the Defendants, ordering that:

    a.  Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States of America has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*;

    b.  Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §3729(d) of the False Claims Act and/or any other applicable provision of law;

    c.  Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(h)(2) of the False Claims Act and/or any other applicable provision of law;

    d.  Relator be awarded the maximum amount allowed pursuant to Cal. Stat. 12652(g)(8);

    e.  Relator be awarded the maximum amount allowed pursuant to Cal. Stat. 12653(b);

    f.  Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d), 31 U.S.C. § 3730(h)(2), Cal. Stat. 12653(b) and any other applicable provision of the law; and,

    g.  Relator be awarded such other and further relief as the Court may deem to be just and proper.

**TRIAL BY JURY IS HEREBY REQUESTED**

    Dated this _8th_ day of May, 2018.

        Respectfully submitted,

BY: _____
        Danielle R. Blandford (KY Bar No. 94957)
        dblandford@forthepeople.com
        **MORGAN & MORGAN KENTUCKY, PLLC**
        420 West Liberty Street, Suite 260
        Louisville, KY 40202
        (502)912-5952 Telephone

        James D. Young (FL Bar No. 567507)

jyoung@forthepeople.com
Sarah A. Foster (FL Bar No. 115462)
sfoster@forthepeople.com
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(904)361-0012 Telephone

*Attorneys for Plaintiff/Relator*